IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CLARENCE SARGENT,

    Plaintiff,               No. CIV S-09-1472 GGH P

    vs.

P. STATTI, et al.,              ORDER;

    Defendants.          FINDINGS AND RECOMMENDATIONS

_____/

        On June 2, 2009, plaintiff consented to the jurisdiction of the undersigned in a filing docketed on June 8, 2009. By Order, filed on October 30, 2009, this court directed the U.S. Marshal to serve the amended complaint, filed on June 10, 2009, upon defendants. Waivers of service were filed by defendants on March 3, 2010. Defendants have yet to submit the form consenting to or declining the jurisdiction of the undersigned. On March 5, 2010, defendants were granted an extension of time until April 10, 2010, to file their responsive pleading.

        In an order, filed on February 24, 2010, defendant Warden McDonald was directed to respond to plaintiff's February 10, 2010, "motion for injunctive relief," construed as a motion for preliminary injunctive relief. In that motion, plaintiff contends that he remains the subject of retaliatory actions stemming from his cooperation in criminal trials against former prison guards. Motion, p. 2. It was noted in the Feb. 24, 2010, order, that a prior motion for a

1

temporary restraining order by plaintiff, alleging that he was under an imminent threat of an attack by his cellmate had been ultimately denied as moot, by Order, filed on September 17, 2009, after the Attorney General's Office indicated that plaintiff had subsequently been moved to single cell housing in a different building, which change in housing plaintiff had conceded.

It has been repeatedly observed that plaintiff alleges, inter alia, that he is "an inmate of special interest" to the California Department of Corrections and Rehabilitation due to safety concerns apparently arising from his past cooperation/assistance in the prosecution of Pelican Bay State Prison departmental staff. Amended Complaint, p. 5. Plaintiff has evidently been in both federal and state custody due to safety concerns over the last number of years. Plaintiff has alleged that his current placement in High Desert State Prison places him at greater risk of being assaulted or killed.

Also, as noted earlier, the gravamen of his amended complaint is that he is being ethnically mis-identified as white when he is "a Native American Indian enrolled in a federally recognized tribe" and is being subjected to racial discrimination, has been denied access to Native American religious services; he also alleges that he has had his attempts to appeal frustrated and has been subjected to retaliation in the form of the threat of physical harm. Amended Complaint, pp. 2, 7, 10-13.

In his present motion,[1] plaintiff, inter alia, specifically alleges that Correctional Officers Callison, Smith and Rainey beat and kicked him on December 2, 2009, after which he felt compelled to go on suicide watch to be removed from the proximity of these officers, and when he asked a nurse to document his injuries from the claimed beating, she refused. Motion,

---

[1] Plaintiff brought a prior motion for a temporary restraining order wherein plaintiff referenced an attack made upon him on December 2, 2009, but failed to adequately identify his alleged attackers, raised issues having no apparent relation to the attack, and significantly overreached in the forms of relief that he sought, was denied without prejudice. See Order, filed on January 14, 2010. An earlier request for immediate injunctive relief was denied as moot, wherein plaintiff alleged that he feared an imminent attack by his cellmate Mike Nichols, when the Attorney General's Office indicated that plaintiff had been moved to a single cell in a different building and plaintiff conceded the point. See Order, filed on September 17, 2009.

pp. 5-6. Upon being returned to his cell, plaintiff discovered that all of his property had been destroyed. Id., at 6. Plaintiff refuses to eat his dinner meals because C/O's Callison, Smith and Rainey throw his dinner trays on the floor. Id.

Of the officers named, it appears that only C/O Smith may have been named as a defendant in the underlying action. The court ordered a response from defendant McDonald within seven days due to the concerns plaintiff raised regarding his physical safety, although the undersigned acknowledged the demands placed upon prison officials and the Attorney General by having to respond to seriatim preliminary injunction motions. In addition, the court stated it was cognizant that plaintiff may be suffering from illnesses creating the perception of retaliation. Defendants' response appears to confirm that plaintiff may either be suffering from paranoia or is simply being disingenuous.

Preliminary Injunction Standard

As the court has previously set forth "[t]he proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" Stormans, Inc. v. Selecky, 571 F.3d 960, 977-978 (9th Cir. 2009), quoting Winter v. Natural Res. Def. Council, Inc., ___ U.S. ___, 129 S.Ct. 365, 375-76 (2008).

In cases brought by prisoners involving conditions of confinement, any preliminary injunction "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct the harm." 18 U.S.C. § 3626(a)(2).

In his response, defendant McDonald maintains that plaintiff's allegations against Officers Callison, Smith and Rainey are unsupported by the evidence. Response (Rsp.), p. 3. The three officers declare that on December 2, 2009, they responded to plaintiff's flooded cell. Id., Callison Declaration (Dec.), ¶ 5; Smith Dec., ¶ 6; Rainey Dec., ¶ 5. Callison and Smith

observed plaintiff splashing and kicking around in approximately a foot of water, water that plaintiff had flooded his cell with by misusing the cell plumbing. Callison Dec., ¶ 5; Smith Dec., ¶ 6. According to the officers, numerous items were floating in the water, including food items and ripped up, confetti-sized pieces of paper, manila-colored envelopes, other papers and books. Id. Officer Callison observed that due to the small pieces of debris, it appeared that plaintiff's possessions had been destroyed by a blender. Callison Dec., ¶ 5. Other items were extensively water damaged, according to the officers. Callison Dec., ¶ 5; Smith Dec., ¶ 6. Only the white administrative segregation jump suit on the cell's top bunk was not destroyed. Id.

According to Officers Callison and Smith, plaintiff told them he was suicidal, and he complied with their order to cuff up. Callison Dec., ¶ 6; Smith Dec., ¶ 7; Rainey Dec., ¶ 6. Callison and Smith aver that they escorted plaintiff downstairs to a medical holding cell without further incident. Callison Dec., ¶ 6; Smith Dec., ¶ 7. According to Officer Callison, he then asked the psychiatric technician, C. Nason, to evaluate plaintiff and take him to the Correctional Treatment Center (CTC). Callison Dec., ¶ 6. C. Nason declares that on December 2, 2009, C/O Callison told her that plaintiff was in a medical holding cell due to having suicidal ideations, whereupon Nason immediately responded. Nason Dec., ¶¶ 4-5. Plaintiff told Nason he was suicidal and asked Nason to hold his glasses until he returned from the CTC; she declares that she never told plaintiff to go on suicide watch to avoid further beatings by unit officers. Nason Dec,, ¶ 6. She also declares that on Dec. 2, 2009, when she responded to plaintiff in the holding cell, that he had no visible injuries nor did he claim to be physically hurt. Id. at ¶ 7. Defendant McDonald maintains that Nason's observation is supported by the CTC documentary evidence, showing that plaintiff had no injuries when he arrived there on Dec. 2, 2009. Rsp., p. 4, Gamberg Dec.,[2] ¶ 4, Attachment 1 - Gamberg interview of plaintiff, p. 2, & Attachment 2 - CDC

---

[2] According to Correctional Lieutenant Gamberg and Warden McDonald, he was asked, on February 26, 2010, by the warden (& per Gamberg, also by Litigation Coordinator Dreith) to interview plaintiff to see if he had any immediate safety concerns. Gamberg Dec., ¶¶ 2-3; McDonald Dec., ¶ 7.

4

7219. Further, defendant contends that had plaintiff been injured to the extent that he claim, his condition would have been documented by staff and he would have had some marks on him upon his discharge from the CTC on Dec. 8, 2009, when he was released from the CTC, but he had no injuries upon his release. Rsp., p. 4, Holzmaier Dec., ¶ 4[3]; Gamberg Dec., ¶ 4, Attachments 1 & 2.

Even assuming that plaintiff had been beaten by Officers Callison, Smith and Rainey (which defendant does not concede), defendant maintains that plaintiff's recent move to another building would ameliorate any future concerns about misconduct on their part. Rsp., p. 4. In Correctional Lieutenant Gamberg's memorandum to the litigation coordinator which includes his Feb. 26, 2010, interview of plaintiff, Lt. Gamberg notes plaintiff's inconsistency regarding the dates of events he claims occurred and the staff whom he alleged responsible and that had he been thrown down by staff in the manner he states, he would have had serious injuries of which there is no record. Gamberg Dec., ¶ 4, Attachment 1& 2. While plaintiff alleged that a few of the officers were abusive, he also admitted to mixing reality and fantasy. Id. Gamberg concluded that plaintiff was fabricating the allegations and he could unearth no supporting evidence for plaintiff's claims and that plaintiff "may be suffering from serious mental issues or that this is just an attempted manipulation on the part of [plaintiff] for the purpose of gaining a transfer to an alternate institution." Gamberg Dec., ¶ 4, Attachment 1.

Moreover, among the exhibits attached to the Attorney General's response is a document that further tends to undermine the credibility of plaintiff's allegations against Officers Callison and Smith. The document at issue is a copy of a handwritten letter or "kite" directed to "Ice," apparently "confiscated" on February 23, 2010, by a C/O D. Ecklebarger. Rsp., pp. 53-57, Ecklebarger Dec. & Attachment 1. C/O Ecklebarger attests to having searched inmate Johnson on Feb. 23, 2010, and having confiscated a kite or note Johnson "was attempting to pass to his

---

[3] H. Holzmaier is employed as the Lead Registered Nurse in the CTC. Holzmaier Dec., ¶ 1.

previous cell mate, inmate Bjorlin." Ecklebarger Dec., ¶3. Another exhibit summarizes the circumstances of discovery of the "kite" and its contents as follows:

> On February 23, 2010 officer Eckelbarger confiscated a kite (letter) from inmate Johnson, CDC # F-68537, FDB6-121L while inmate Johnson was being searched to go to ASU exercise yard. The kite was folded very small with a rubber band wrapped around it. The kite was addressed to "ICE" which is the documented AKA for inmate Bjorlin P-78253, FDB-6-112L. The kite contained the names of officers K. Swart, E. Callison, and T. Smith. In the body of the kite inmate Johnson spoke to circumventing a legal process by seeing the mental health department and being placed on EOP status. Also in the note inmate Johnson spoke to filing multiple briefs and paperwork against officers K. Swart, E. Callison and T. Smith in order to keep their names "coming up", stating in part, "we must tear their asses up from different directions", " these fools will never have time to let shit settle down because we're on that ass like some sharks in bloody fucking water, see Callison's name is coming up too much and Swart's ass is in the meat grinder," and " when the shit hits the fan its going to be a fucking catastrophic disaster for those slimy dog sons of bitches, they will not have a second to recuperate". A copy of this kite was taken to the Litigation coordinator, and placed in inmate Johnson's ASU 114 file.

This exhibit is signed by E. Callison and dated February 26, 2010. Callison Dec., Attachment 1. Although Callison has corrected some of the spelling in the original "kite," this summary of the contents of the confiscated letter does not appear to be inaccurate or unfair. While this note does not directly implicate this plaintiff, it could lead to the inference that plaintiff, also an administrative segregation inmate, is among those inmates who may be unfairly targeting, inter alia, Officers Callison and Smith in actions and motions such as the instant one.

Defendant also argues that there is little support for the allegation that Officers Callison, Smith and Rainey destroyed plaintiff's property or threw his dinner trays down or that plaintiff has refused to eat for that reason. Rsp., pp. 5-6. After plaintiff's cell was flooded the damage was so extensive, according to Officers Callison and Rainey, that they wore protective suits to clean due to the smell of feces and urine, and the debris was removed with snow shovels and garbage bags. Callison Dec., ¶ 7; Rainey Dec., ¶¶ 6-7. They declare that anything salvageable, such as legal books, papers that were whole and other property, was put in bags

6

placed against the wall on the dayroom floor, where the bags remained until plaintiff was returned from CTC about a week later, after which plaintiff told Officer Smith to "throw that shit away." Id. & Smith Dec., ¶ 9.

As to plaintiff's claim that he has refused to eat his evening meal since Dec. 2, 2009, because of Callison and Smith throwing it on the floor, CDC 114A forms, according to defendant, do not support that allegation. Rsp., p. 6, McDonald Dec., ¶ 9, Attachment 3. These forms are completed by shift officers with an "R" placed in the appropriate box if a meal is refused. Id. It appears to the court, upon its review of the records, that defendant is correct that an "R" is placed only for dinner served on Dec. 2, 2009, indicating that he only refused dinner on that date.

In light of the evidence produced by the defendant, the court finds that plaintiff simply does not meet his burden to show that he is likely to suffer irreparable harm in the absence of preliminary injunctive relief, that the balance of equities tips in his favor, and that an injunction is in the public interest in this instance, even if the court were to find that plaintiff is likely to prevail on the merits of the underlying action, which the court is unable to fully assess at this point.

Accordingly as defendants have accepted service and have not consented, IT IS ORDERED that the Clerk shall assign a district judge to this case;

IT IS HEREBY RECOMMENDED that plaintiff's motion for preliminary injunctive relief, filed on February 10, 2010 (docket # 48), be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one (21) days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within seven (7) days after service of the objections. The

parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: March 10, 2010

/s/ Gregory G. Hollows
_____
UNITED STATES MAGISTRATE JUDGE

GGH:009
sarg1472.ord3